# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# ABERDEEN DIVISION

LATISHA MITCHELL                                                                                   PLAINTIFF

V.                                                                CIVIL ACTION NO. 1:13-CV-00049-SA-DAS

CITY OF TUPELO, MISSISSIPPI                                                                        DEFENDANT

## MEMORANDUM OPINION

Plaintiff brought this action alleging race discrimination under the Civil Rights Act of 1964 and 42 U.S.C. § 1981, disability discrimination under the Americans with Disabilities Act, and retaliation under the Civil Rights Act of 1964. Defendant has filed a Motion for Summary Judgment [64].[1] Upon due consideration of the motion, responses, rules, and authorities, the Court finds as follows:

*Factual and Procedural Background*

Plaintiff Latisha Mitchell was employed by Defendant City of Tupelo, Mississippi as a bailiff for the Municipal Court. While on duty on March 22, 2010, Mitchell discovered that an inmate at the Lee County jail had attempted to commit suicide by hanging himself in his cell. In attempting to aid the inmate, Mitchell injured her neck and shoulder as a result of the incident.

In December 2011, a position as the Work Program Coordinator became available with the Municipal Court and Mitchell applied. She was interviewed, but Tupelo ultimately hired an external applicant named Jay Marshall, a white male. Thereafter, on February 24, 2012, Mitchell filed a charge of discrimination based on race and gender with the Equal Employment Opportunity Commission.

---

[1] Also pending before the Court is Plaintiff's Motion for Leave to File Counter-Affidavit of Latisha Mitchell [77]. Mindful that "a self-serving affidavit, without more evidence, will not defeat summary judgment," Sanchez v. Dallas/Fort Worth Int'l Airport Bd., 438 F. App'x 343, 346-47 (5th Cir. 2011) (citing DIRECTV, Inc. v. Budden, 420 F.3d 521, 531 & n.49 (5th Cir. 2005)), the Court exercises its discretion under Federal Rule of Civil Procedure 56(e)(1) and hereby GRANTS Plaintiff's motion.

Mitchell was involved in an off-duty traffic stop on April 3, 2012. Following an investigation of that incident, Tupelo scheduled Mitchell for a firearm qualification attempt on May 4, 2012. Mitchell reported to the firearm range the next day, providing a medical excuse from Lee Wallace, CFNP, that stated Mitchell was "unable to shoot . . . due to muscle spasms and weakness to both arms and shoulders." Mitchell's supervisor, Captain Larry Montgomery, requested that she return the weapon issued to her by Tupelo and relieved her from her duties as a bailiff. Over the next several months, Mitchell worked a variety of light duty assignments, and Tupelo made several additional attempts to reschedule her for firearm qualification. During this time, on August 1, 2012 and February 8, 2013, Mitchell filed two additional charges with the EEOC alleging Tupelo retaliated against her after she filed her initial charge. Mitchell received right to sue letters from the EEOC regarding her first and second charges on December 10, 2012 and her third charge on July 23, 2013.

On January 10, 2013, Mitchell was notified that her latest light duty assignment was ending, that no other light duty assignments were available, and that she would be required to take unpaid leave under the Family Medical Leave Act ("FMLA") until she was able to requalify with a firearm and return to regular duty as a bailiff. Mitchell filed the instant action, alleging Tupelo discriminated against her on the basis of her race, discriminated against her by refusing to accommodate her disability, and retaliated against her because she filed EEOC charges.

*Summary Judgment Standard*

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when the evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

*Analysis and Discussion*

Title VII Race Discrimination

Mitchell claims Tupelo illegally discriminated against her because of her race[2] when it failed to hire her for the Work Program Coordinator position. Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to discriminate against any individual with respect

---

[2] Initially, Mitchell brought claims for discrimination based on both her race and her sex. However, Mitchell did not address her sex discrimination claim at summary judgment, despite Tupelo's motion. Accordingly, the Court deems Mitchell's sex discrimination claim to have been abandoned. See Sanders v. Sailormen, Inc., 2012 WL 663021, at *3 & n.30 (S.D. Miss. Feb. 28, 2012) ("Failure to address a claim results in the abandonment thereof.") (collecting cases), aff'd, 506 F. App'x 303 (5th Cir. Jan. 7, 2013); see also Nationwide Ins. Co. v. Lexington Relocation Servs., LLC, 2014 WL 1213805, at *7, n.3 (N.D. Miss. Mar. 24, 2014); Dean v. One Life America, Inc., 2013 WL 870352, at *2 (S.D. Miss. Mar. 7, 2013).

3

to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

In addition to her Title VII discrimination claim, Mitchell alleges Tupelo has violated 42 U.S.C. § 1981 and brings her claim pursuant to 42 U.S.C. § 1983. While Section 1981 does not provide a remedy against governmental entities, its "prohibitions against a private actor's racial discrimination are properly asserted against a state actor under 42 U.S.C. § 1983." King v. Louisiana, 294 F. App'x 77, 82 n. 4 (5th Cir. 2008) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989); Oden v. Oktibbeha Cnty, Miss., 246 F.3d 458, 463-64 (5th Cir. 2001)). "Section 1983 and Title VII are parallel causes of action," Lauderdale v. Tex. Dep't of Crim. Justice, 512 F.3d 157, 166 (5th Cir. 2007) (citation omitted), and thus employment discrimination claims brought under Section 1981 "are analyzed under the evidentiary framework applicable to claims arising under Title VII of the Civil Rights Act of 1964." Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309, 311 (5th Cir. 1999) (per curiam). See also Shackleford v. Deloitte & Touche, LLP 190 F.3d 398, 402 n.2 (5th Cir. 1999) ("When used as parallel causes of action, Title VII and section 1981 require the same proof to establish liability.").

Where, as here, a plaintiff relies only on circumstantial evidence to prove her discrimination claim, the Court utilizes the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "Under this framework, the plaintiff must first create a presumption of discrimination by making out a prima facie case of discrimination." Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003) (internal citations omitted). If the plaintiff can establish a prima facie case, "the burden of production shifts to the employer, who must offer an alternative nondiscriminatory explanation for the adverse

employment action." Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009). If the defendant can articulate such a nondiscriminatory reason, the burden then shifts back to the plaintiff who must show at "a new level of specificity" that the explanation is merely a pretext for discrimination. Thornbrough v. Columbus & Greenville R.R. Co., 760 F.2d 633, 639 (5th Cir. 1985), *abrogated on other grounds by* St. Mary's Honor Center v. Hicks, 509 U.S. 502, 513, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). In the alternative, the plaintiff may show "that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." Alvarado v. Tex. Rangers, 492 F.3d 605, 611 (5th Cir. 2007) (quoting Rachid v. Jack In The Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004)). See also 42 U.S.C. § 2000e–2(m).

In a failure to hire claim, to establish a prima facie case Mitchell must show that "(1) [s]he belongs to a protected class; (2) [s]he applied for and was qualified for a position for which applicants were being sought; (3) [s]he was rejected; and (4) a person outside of [her] protected class was hired for the position." Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc., 482 F.3d 408, 412 (5th Cir. 2007) (citation omitted). Tupelo concedes that Mitchell has met her burden under the first and third prongs, acknowledging that she is a member of a protected class and that she suffered an adverse employment action when she was not hired as the Work Program Coordinator. Additionally, Mitchell has clearly established the fourth prong of her prima facie case as it is undisputed that Tupelo hired Jay Marshall, a white male for that position. While Tupelo contends that Mitchell was not as qualified as Marshall, it stops short of arguing that she was unqualified for the position.

Further, Mitchell acknowledges that Tupelo has articulated a legitimate, nondiscriminatory reason for failing to hire her – because she was not as qualified as Marshall.

5

However, Mitchell argues that this reason is not the true reason for Tupelo's failure to hire her. In support of this contention, Mitchell argues that she was in fact better qualified than Marshall, that the decision maker had a demonstrated racial bias against her, that Tupelo utilized only subjective hiring criteria, and that Tupelo's witnesses are interested in the outcome of the case. The Court addresses each of these arguments in turn.

"[A] 'fact finder can infer pretext if it finds that the employee was clearly better qualified (as opposed to merely better or as qualified) than the employees who are selected.'" Churchill v. Texas Dep't of Criminal Justice, 539 F. App'x 315, 318 (5th Cir. 2013) (quoting EEOC v. La. Office of Cmty. Servs., 47 F.3d 1438, 1444 (5th Cir. 1995)). However, "[s]howing that two candidates are similarly qualified does not establish pretext . . . ." Price v. Fed. Exp. Corp., 283 F.3d 715, 723 (5th Cir. 2002). Instead, a plaintiff "must present evidence from which a jury could conclude that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" Moss v. BMC Software, Inc., 610 F.3d 917, 923 (5th Cir. 2010) (quoting Deines v. Tex. Dep't of Protective and Regulatory Servs., 164 F.3d 277, 280-81 (5th Cir. 1999)). Indeed, "unless the qualifications are so widely disparate that no reasonable employer would have made the same decision, any differences in qualifications are generally not probative evidence of discrimination." Id. (quotation marks and citations omitted). "Thus, the bar is set high for this kind of evidence." Id. (quotation marks and citations omitted).

The job description for the Work Program Coordinator position lists the following, non-exhaustive list of responsibilities:

1) Oversee the operation of the Municipal Court Work Program.
2) Serve as a Deputy Court Clerk for affirmations.
3) Work closely with the Field Superviser to provide the necessary placement and job assignments for workers assigned to the program.

6

4) Maintain accurate accounting of all hours worked for service credit against the worker's debt to the City of Tupelo.
5) Update Court computer software (AS400) to reflect work credit hours against worker's debt to the City.
6) Be present in court to enroll individuals assigned by the Court to the program.
7) Currently have o[r] can obtain within 30 days of hiring a Class "B" Commercial DL or greater.
8) Serve as Field Supervisor whenever the need arises due to illness or injury to current Field Supervisor.
9) Maintain accurate time keeping records for payroll purposes of all members of the Work Program Division.
10) Other duties as assigned by the Court Director.

Mitchell claims she was more qualified than Marshall based on her years of experience as a bailiff, her familiarity with the computer system used in the position, the fact that she was a college graduate, and an internal applicant. However, Contanna Purnell, one of the individuals involved in hiring the Work Program Coordinator, testified that she selected Marshall because he had management experience, had a commercial driver's license, and had law enforcement experience as a Tupelo reserve police officer. Mark Miller, another individual involved in the selection process, signed an affidavit stating essentially the same reasons for selecting Marshall for the job.

The Fifth Circuit has held that "better education, work experience, and longer tenure with [a] company" do not necessarily establish that a plaintiff is clearly better qualified. Price, 283 F.3d at 723 (citing Nichols v. Lewis Grocer, 138 F.3d 563, 568–69 (5th Cir. 1998)); see also Churchill, 539 F. App'x at 322 ("Demonstrating that one is 'clearly better qualified' is understandably very difficult to meet so as to avoid judicial second-guessing of business decisions . . . ."). The Court cannot say Tupelo's decision to hire Marshall was outside the "realm of reason" and thus Mitchell has failed to establish pretext through a showing that she was clearly better qualified. Churchill, 539 F. App'x at 321 ("One can hardly find mendacity by

7

the employer when 'its judgments on qualifications are somewhere within the realm of reason.'") (quoting Deines, 164 F.3d at 282).

Mitchell also argues that Tupelo relied solely on subjective criteria when selecting Marshall over her for the Work Program Coordinator position. This alone is insufficient to establish pretext, however. A Fifth Circuit panel very recently affirmed that "[t]he mere fact that an employer uses subjective criteria is not . . . sufficient evidence of pretext." Gregory v. Town of Verona, Miss., 2014 WL 3041214, at *3 (5th Cir. July 7, 2014) (citing Manning v. Chevron Chem. Co., LLC, 332 F.3d 874, 882 (5th Cir. 2003)). As the Fifth Circuit has previously explained, "[a]n employer's subjective reason for not selecting a candidate . . . may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection." Alvarado, 492 F.3d at 616; see also Patrick v. Ridge, 394 F.3d 311, 317 (5th Cir. 2004) (recognizing that the McDonnell Douglas framework "does not mean that an employer may not rely on subjective reasons for its personnel decisions").

Mitchell claims her supervisor, Captain Larry Montgomery, was the actual decisionmaker who selected the Work Program Coordinator[3] and that he had a demonstrated racial bias against her. Mitchell argues that Montgomery treated a white female, Paula Furniss, more favorably than he treated Mitchell by allowing Furniss to freely take leave from work but not Mitchell. Jennifer Brinkley, also a Tupelo employee and black female, testified that Montgomery allowed Furniss to take time off, even when she did not have any leave accrued, and that Furniss was able to make that time up by working on holidays and some weekends. However, Brinkley also testified that it was common practice for all municipal court employees to make up time off

---

[3] Tupelo contends Montgomery played no role in the decision to hire Marshall instead of Mitchell. Montgomery testified that he appointed Contanna Purnell and Mark Miller to sit on the interview panel and score the applicants performance. Tupelo offers affidavits signed by Purnell and Miller stating that they unanimously agreed to hire Marshall without influence from Montgomery or anyone else.

8

when they had no leave available. While Brinkley testified that she believed Furniss received preferential treatment, she also testified that she did not know why. Mitchell argues that unlike Furniss, she was not allowed to take time off, even to care for her dying sister-in-law. However, Brinkley testified that Mitchell had hoped to be able to take FMLA leave and that she did not know why Mitchell was not able to do so.[4] Further, while the leave sheets offered by Mitchell do show that Furniss often took off work and later made up the time missed, they also show where Mitchell left work for physical therapy appointments. Such evidence does not raise a genuine issue of material fact as to whether Montgomery held a racial bias against Mitchell.

Mitchell also alleges Montgomery posted a racially insensitive sign at the municipal court. In her sworn affidavit, Mitchell avers that Montgomery "posted a notice in municipal court that it would be closed due to observance of Robert E. Lee Day, even though the handbook specifically stated it would be closed in observance of Martin Luther King, Jr. Day." She further states that "[t]his caused humiliation to [her] and to other black employees who worked at municipal court." Mitchell's allegations are supported by the testimony of Brinkley, who testified in her deposition that she was personally offended by Montgomery's posting about Martin Luther King, Jr. Day and that she thought other black employees were likewise offended.

Though such a declaration might certainly be racially motivated, see, e.g., Ash v. Tyson Foods, Inc., 546 U.S. 454, 456, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006) (holding that the term "boy" may be evidence of racial animus, depending on the context in which it is used), this evidence alone is insufficient to create a genuine issue of material fact as to whether Tupelo failed to hire Mitchell because of her race. Mitchell has provided no evidence as to when Montgomery posted the notice about Martin Luther King, Jr. Day so as to provide any context

---

[4] Mitchell does not bring any claims in this action under the FMLA.

9

from which a reasonable juror might infer Montgomery did not want to hire Mitchell for the Work Program Coordinator position because of her race.

Further, Montgomery was the person who hired Mitchell when she first became a bailiff. See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 228 n.16 (5th Cir. 2000) ("The 'same actor' inference arises when the individual who allegedly discriminated against the plaintiff was the same individual who hired the plaintiff and gives rise to an inference that discrimination was not the motive behind plaintiff's termination."); Hervey v. Mississippi Dep't of Educ., 404 F. App'x 865, 871 (5th Cir. 2010) (It "hardly mak[es] sense for an employer to hire employees from a group against which [the employer] bears racial animus and then turn around and fire them once they are on the job."). Accordingly, the Court finds that, even if Mitchell could show Montgomery was the decisionmaker for the Work Program Coordinator position, Mitchell has failed to demonstrate a genuine issue of material fact as to whether Tupelo's stated reasons for hiring someone else were pretextual and summary judgment is merited.

## Disability Discrimination

Mitchell also claims Tupelo violated the Americans with Disabilities Act ("ADA") by failing to reasonably accommodate her disability. Here, too, the Court applies the McDonnell-Douglas evidentiary framework. Chevron Phillips Chem. Co., LP, 570 F.3d at 615. To establish a prima facie case of discrimination based on failure to accommodate a disability, a plaintiff must show that "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen., 730 F.3d 450, 452 (5th Cir. 2013) (quotation marks and citations omitted). A "'qualified individual' means an individual who, with or without

reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Tupelo argues first and foremost that Mitchell cannot make out a prima facie case because she did not have a disability within the meaning of the ADA. As the Fifth Circuit has recognized, "[t]he threshold issue in a plaintiff's prima facie case is a showing that she suffers from a disability." Lanier v. Univ. of Texas Sw. Med. Ctr., 527 F. App'x 312, 318 (5th Cir. 2013) (citing Talk v. Delta Airlines, Inc., 165 F.3d 1021, 1024 (5th Cir. 1999) (per curiam)). "The term 'disability' means, with respect to an individual - (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

As amended by Congress in 2008, the ADA requires the Court to construe "[t]he definition of disability ... in favor of broad coverage of individuals ... to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). In amending the ADA, Congress found that the holdings of the United States Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999), and Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002), had "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect[.]" Pub. L. No. 110–325, Sept. 25, 2008, 122 Stat. 3553. In the absence of Fifth Circuit precedent construing

and applying the ADA Amendments Act, another district court sitting in Mississippi recently looked to EEOC regulations for guidance. Wheat v. Rush Health Sys., Inc., 2014 WL 3529798, at *3-4 (S.D. Miss. July 15, 2014). Those regulations provide in pertinent part:

> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.
>
> (iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.
>
> . . .
>
> (v) The comparison of an individual's performance of a major life activity to the performance of the same life activity by most people in the general population usually will not require scientific, medical, or statistical analysis . . . .

29 C.F.R. § 1630.2(j)(1).

Mitchell's treating physical therapist, Renee Willis, testified in her deposition that from the time of her injury in 2010 Mitchell suffered severe pain, decrease in range of motion of her shoulder, decreased grip strength, difficulty rolling onto her side, difficulty getting in and out of a vehicle, and difficulty bathing, dressing, and sleeping. She also testified that Mitchell suffered from muscle spasms that prevented her from being able to attempt to requalify with a firearm. Given Congress's clear intent to broaden the definition of "disability" under the ADA, the Court finds that Mitchell has raised a genuine issue of material fact as to whether she was disabled under the ADA.

Mitchell alleges Tupelo failed to accommodate her in two specific ways: by failing to hire her as the Work Program Coordinator and by refusing to restructure the bailiff position in such a way that Mitchell could continue in the position without being required to recertify with a firearm or participate in serving warrants or executing arrests. Under the ADA, a reasonable accommodation may include job restructuring or reassignment to a vacant position. 42 U.S.C. § 12111(9)(B). However, "[i]t is the plaintiff's burden to request reasonable accommodations," Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 735 n.4 (5th Cir. 1999), and "[a] disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously." Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 622-23 (5th Cir. 2000).

With regard to the Work Program Coordinator position, it is undisputed that Purnell, Montgomery, and other Tupelo employees were aware Mitchell had been injured on the job in 2010. Though Tupelo claims the decisionmakers were unaware Mitchell had any disability, Mitchell states in an affidavit dated May 6, 2014 that she "assumed [she] would be given the [Work Program Coordinator] position because of my injuries that I had discussed with Captain Montgomery," and, in an affidavit dated July 2, 2014 that she "told Purnell that the reason [she] needed to move from the bailiff position was that every time [she] arrested someone, [she] would aggravate [her] injuries, and for that reason [she] needed to get the Work Coordinator Position or some other position that would not cause me further physical harm." Willis, Mitchell's physical therapist, also testified that Montgomery called Mitchell several times during her therapy sessions and that her clinic notified Montgomery by mail in December 2011 that Mitchell was under their care. Additionally, Willis testified that Mitchell had aggravated her injuries while executing arrests on July 27, 2011 and November 15, 2011, and Willis' records indicated that

13

Mitchell "has been involved in several incidents which have been reported to her superior officer."

Mitchell has demonstrated the existence of a genuine issue of material fact as to whether Tupelo was aware of her alleged disability and whether she requested to be moved to the vacant Work Program Coordinator position as an accommodation to that disability. Thus, the Court finds Mitchell has raised a genuine issue of material fact as to whether Tupelo failed to reasonably accommodate her when it refused to move her to the Work Program Coordinator position.[5]

Mitchell also argues that Tupelo failed to reasonably accommodate her by restructuring the bailiff position so that she would not be required to requalify with a firearm or execute arrests. On May 3, 2012, Mitchell was told to report the next day to the North Mississippi Law Enforcement Training Center ("Training Center") to attempt requalification with a firearm. However, on May 4, 2012 Mitchell provided a note from her treating physician stating that she was unable to attempt to requalify due to muscle spasms and weakness in both arms. Because she was medically unable to qualify with a firearm, Montgomery relieved Mitchell of her duties as bailiff later that day and moved her to a temporary light duty position. Over the course of approximately eight months, Mitchell worked in a number of different light duty positions and continued to earn her regular rate of pay. Montgomery continued to request that Mitchell attempt to qualify with a firearm, but each time Mitchell provided a medical restriction from her treating physician. Eventually, Tupelo required Mitchell to take unpaid FMLA leave.

---

[5] The Court notes that Mitchell undisputedly desired to continue earning her rate of salary as a bailiff while working as the Work Program Coordinator and suggested that she be allowed to combine duties of both the bailiff position and Work Program Coordinator position in order to maintain her higher rate of pay. While Tupelo was not obligated to fulfill these requests, Allen, 204 F.3d at 622-23, a reasonable juror might still find Tupelo failed to reasonably accommodate Mitchell by failing to offer her the Work Program Coordinator position without modification and at the lower rate of pay.

Mitchell argues that rather than place her on temporary light duty, Tupelo should have restructured the bailiff position so that she could have continued without having to requalify with a weapon or execute arrests. Tupelo, however, contends that these were essential functions of the job and restructuring was therefore not a reasonable accommodation. "While [a reasonable accommodation] may include job restructuring, the ADA does not require an employer to eliminate or transfer any of the essential functions of a position, [or] to create a new job as an accommodation." Hernandez v. Aldine Indep. Sch. Dist., 1999 WL 683805, at *3 (citing Barber v. Nabors Drilling U.S.A., Inc., 130 F.3d 702, 709 (5th Cir. 1997); Still v. Freeport-McMoran, Inc., 120 F.3d 50, 53 (5th Cir. 1997)).

Mitchell disputes that qualifying with a firearm and executing arrests are essential functions of the bailiff position by arguing that Tupelo has not consistently required bailiffs to perform those duties. Mitchell testified in her deposition that bailiffs were not required to qualify with a firearm from 2005 to 2007 and that bailiffs were not required to serve warrants during a period of time of approximately a year and a half before that. Mitchell testified that Montgomery had explained that the municipal court was separate from the police department and therefore the firearms qualification requirement did not apply to the bailiffs. Further, Mitchell testified that the reason bailiffs didn't serve arrest warrants for a period of time was that one of the bailiffs was under the care of a doctor. While Tupelo was not required to "eliminate or transfer any of the essential functions" of the bailiff position, the Court finds Mitchell has raised a genuine issue of material fact as to whether carrying firearms and executing arrests were essential functions of the bailiff position. Accordingly, summary judgment is not appropriate as to Mitchell's claims for disability discrimination.

Retaliation

In addition to her discrimination claims, Mitchell claims Tupelo retaliated against her in violation of Title VII. "To establish a prima facie case of retaliation, [a] plaintiff must establish that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." McCoy v. City of Shreveport, 492 F.3d 551, 556-57 (5th Cir. 2007). Importantly, "[t]he antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

Mitchell argues Tupelo retaliated against her in several ways as a result of her protected activity – the filing of EEOC charges. Specifically, Mitchell contends she suffered adverse employment actions when Tupelo refused to place her in available positions, refused to keep her in available positions, refused to allow her to work a part-time job, and discontinued her pay on false grounds. Tupelo argues that none of these actions constitute adverse employment actions and that Mitchell therefore fails to meet her burden of establishing a prima facie case of retaliation. However, unlike in the context of discrimination claims, the Supreme Court has held that to support a claim of retaliation an adverse employment action does not have to affect a term, condition, or status of employment to be actionable. Id. at 61, 126 S. Ct. 2405. To satisfy the adverse employment action requirement of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which. . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68, 126 S. Ct. 2405.

As the Supreme Court has explained, "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his

or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, --- U.S.---, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (June 24, 2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. at 2533, 186 L. Ed. 2d 503.

Mitchell alleges that after she filed her initial EEOC charge on February 24, 2012, Montgomery retaliated against her preventing her from working a part-time security position. On April 3, 2012, Mitchell was involved in a traffic stop with a Baldwyn, Mississippi officer while driving home from her second job as a security guard for a local grocery store. Tony Carleton, then the Tupelo Chief of Police, testified that the Baldwyn Police Chief called him after the incident, complaining that Mitchell had been rude and unprofessional to his officer. Carleton further testified that he asked internal affairs to conduct an investigation. Mitchell, however, claims Montgomery ordered the investigation, and Montgomery testified that he sought permission from Carleton to request an internal investigation. Regardless, it is clear that an internal investigation into the incident was conducted as a result of a complaint by another law enforcement agency. Mitchell has failed to show that "but for" her having filed an EEOC charge, Tupelo would not have investigated the incident.

On April 12, 2012 Montgomery informed Mitchell that she could not continue to work her part-time job while she was under investigation. Mitchell alleges Montgomery was retaliating against her because she had never heard of such a policy and she claims two other officers were allowed to continue working part-time jobs while under investigation. Montgomery testified that, although he had not seen it in writing, he had always understood the policy to be that officers were not allowed to work off-duty security positions while under an

internal investigation. Tupelo argues that the policy had been enacted several months before the incident at issue and offers a portion of the Tupelo Police Department Standard Operating Procedures dealing with off-duty employment that states that an "officer cannot be under an internal investigation or on probation due to an internal investigation" in order to be eligible for off-duty work.

However, while Tupelo argues this policy was promulgated in the fall of 2011, the effective date for this policy is not clearly legible on the copy provided to the Court, and Tupelo has not provided any other evidence as to when this policy was enacted. Similarly, Mitchell states in her affidavit that two other officers were allowed to work off-duty jobs while under investigation but does not provide relevant timeframes. Still, other Tupelo officers testified that they did not have any knowledge about such a policy and Montgomery himself testified that he had never applied the policy to anyone other than Mitchell. Given the lack of clarity in the record as to when the policy prohibiting off-duty employment while under investigation and whether such a policy was uniformly applied, the Court finds that a genuine issue of material facts exists as to whether Montgomery would have allowed Mitchell to continue her off-duty employment but for her filing of the initial EEOC charge.

Mitchell also argues that Tupelo retaliated against her by discontinuing her pay on false grounds. Tupelo claims that Mitchell was required to take unpaid FMLA leave in January 2013 because it no longer had any light duty positions. While "[r]easonable accommodation does not require an employer to wait indefinitely for the employee's medical conditions to be corrected," Silva v. City of Hidalgo, Tex., 13-41064, 2014 WL 3511685, at *2 (5th Cir. July 17, 2014) (quoting Rogers v. Int'l Marine Terminals, Inc., 87 F.3d 755, 760 (5th Cir. 1996) (further citation omitted)), Mitchell contends light duty work was available at the time she was forced to take

unpaid leave and that Tupelo would not have terminated her last light duty assignment but for her having filed charges with the EEOC.

Immediately before taking unpaid leave, Mitchell had been assigned to a light duty position at the Training Center. She testified that she had not yet completed the task she was assigned to perform when she was notified that no more light duty work was available. Tupelo offers the testimony of Cassandra Moore, an employee in Tupelo's human resources department, who testified that Mitchell's light duty position at the Training Center ended upon the return of the permanent employee whose job Mitchell had been performing in the employee's absence. However, Mitchell testified that the permanent employee, Desha Miller, worked alongside Mitchell for a period of time performing other tasks before taking leave temporarily. Mitchell testified that she was not assigned to fill in for Miller but was instead given a separate assignment.

Tupelo also points to Officer Jason Whittington as another employee who was only given a temporary light duty assignment before being required to take unpaid FMLA leave. In his deposition, though, Whittington testified that it was his decision to take leave rather than continue with his light duty position. Further, Scott Speaks, the Assistant Director of the Training Center, testified that "there's a lot of stuff [at the Training Center] that somebody could do that wouldn't require any physical exertion whatsoever," and "[w]e can always find something to do as far as maintenance, paperwork, helping with phone duties, wherever needed." Speaks answered affirmatively when asked, "As of right now, if some of the higher-ups at the city wanted to send an officer out there, y'all could give him work to do right now?" Thus, the Court finds a genuine dispute of material fact exists as to whether Tupelo would have

discontinued Mitchell's light duty assignment but for the fact that she had filed three EEOC charges within the previous year and summary judgment is not appropriate.

*Conclusion*

For the foregoing reasons, the Court finds Tupelo's Motion for Summary Judgment [64] is GRANTED IN PART AND DENIED IN PART. Mitchell's claim for intentional discrimination in violation of Title VII is dismissed with prejudice. Her claims for disability discrimination based upon a failure to accommodate and retaliation in violation of Title VII remain. Additionally, Mitchell's Motion for Leave to File Counter-Affidavit [77] is GRANTED. A separate order to that effect shall issue this day.

SO ORDERED on this, the 11th day of September, 2014.

    /s/ Sharion Aycock_____
    UNITED STATES DISTRICT JUDGE